IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TERMANO, LLC | ) | |
|    d/b/a Country Club Apartments, | ) | Chief Judge Carol A. Doyle |
| | ) | |
|    Debtor and Debtor in Possession. | ) | Case No. 09-08457 |

**SECOND AMENDED DISCLOSURE STATEMENT**

This Second Amended Disclosure Statement ("Disclosure Statement") is filed by the Debtor TERMANO, LLC d/b/a Country Club Apartments (the "Debtor"), dated February 11, 2010 in connection with the Debtor's Second Amended Plan of Reorganization ("Plan") also filed by the Debtor on February 11, 2010. This Disclosure Statement is intended to provide creditors with information of a kind and in sufficient detail of the Debtor's history and of the condition of the Debtor's books and records to allow creditors to make an informed judgment when voting on the Plan. Creditors are advised that, after review, the Court may approve the Disclosure Statement, but such approval does not constitute endorsement.

**I. SUMMARY:**

On March 13, 2009 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code (the "Code"). The Debtor remains in possession of its assets and continues to generate income pursuant to §§ 1107 and 1108 of the Bankruptcy Code. The Debtor, a condominium developer, conducts its business at 269 Blackhawk Road, Riverside, Illinois 60546.

The Debtor is proposing a three year plan of reorganization. The Plan will be funded from future revenues generated from renting, rehabbing, and selling condominium units located at 904 N. Broadway and 908 N. Broadway in Urbana, Illinois. Pursuant to the Plan, the Debtor will be the disbursing agent. In the Plan, claims are divided into Unclassified, Class I, Class II,

1

Class III, and Class IV claims, and Class V equity interests. A summary of treatment of the

Classes is below:

| Class | Plan Treatment | Projected Recovery | Status | Voting Rights |
|---|---|---|---|---|
| Administrative claims | Payment in full in cash | 100% | N/A | N/A |
| CLASS I<br>  Secured claim<br>  of Centrue Bank | Payment in full over life of plan from rental and sale of estate property | 100% | Impaired | Yes |
| CLASS II<br>  Secured claim of City of Urbana | Payment in full prior to implementation of plan | 100% | Unimpaired (paid in full) | No (presumed to accept) |
| CLASS III<br>  Priority unsecured claims | Payment in full prior to implementation of plan | 100% | Unimpaired (paid in full) | No (presumed to accept) |
| CLASS IV<br>  General unsecured claims | Pro rata share of funds withheld from sale of estate property | 100% | Impaired | Yes |
| CLASS V<br>  Equity holders | Residual distributions | Unknown | N/A | N/A |

Holders of Claims of Classes I-IV either have been paid or will be paid the full amount of their Allowed Claims. The holder of Class I Claims (the Secured Creditor) will receive 6% annual interest on the declining balance of its claims. Debtor believes that it has already satisfied claims II and III and that it will have the necessary funds to pay Classes I and IV 100% of their allowed claims through the Plan.

Creditors who have been scheduled but have not filed proofs of claim, and have not been listed as "disputed, unliquidated, or contingent", will be paid according to the claim amount

listed in the Debtor's schedules, unless the Debtor objects to the claim within the time set forth in Debtor's plan.

Class I is comprised solely of the Secured Claim held by Centrue Bank. To the extent the claim is allowed, the holder of the allowed Class I claim will begin receiving payments ahead of all other holders of allowed claims. Centrue Bank will also receive 6% annual interest on the declining balance of its allowed claim.

Class II claims are the Secured Claims held by the City of Urbana to the extent they are allowed and not previously paid. According to the closing statement on the 10-unit sale on 11/2/09 (see below), Class II claims have been paid in full from the gross proceeds of the sale. Therefore, Debtor will object to any further payment on these claims.[1]

Class III claims are the Unsecured Claims Entitled to Priority by the Bankruptcy Code, 11 U.S.C. §507(a)(1) - (10), to the extent that they are allowed and not previously paid. According to the closing statement on the 10-unit sale on 11/2/09 (see below), the Class III claims of City of Urbana have been paid in full from the gross proceeds of the sale. Therefore, Debtor will object to any further payment on these claims..

Class IV claims are the General Unsecured Claims without Priority (excluding Unclassified Claims as defined in the Debtor's Plan) to the extent that they are allowed. Class IV claims will receive payments only after the holders of Class I, II, and III claims are paid in full for their allowed claims, including interest accrued on Class I and Class II claims.

Class V equity interests are the equity interests of Eric Olsauskas, the sole and managing member of Termano, LLC, the Debtor. Eric Olsauskas will receive distributions if and only if

---

[1] Debtor contends that all Class III claims of the City of Urbana have been paid in full from the gross proceeds of the 10-unit sale that closed on 11/2/09. From that closing, City of Urbana was paid the following sums: $6,405.64, $2,419.49, $51.45, and $365. Debtor will object to any further payment toward pre-petition debts owing to City of Urbana.

3

senior holders of Classes I-IV claims receive 100% distribution.  Eric Olsauskas will maintain his ownership interest in the Debtor after confirmation.

## II. FINANCIAL DIFFICULTIES AND BACKGROUND OF DEBTOR

The Debtor began it operations in April 2005 with the purchase of the Country Club Apartments, consisting of 108 units located at 904-908 N. Broadway Avenue in Urbana, Illinois. The property was situated on about 3 acres and was comprised of 6 buildings, three 12-unit buildings and three 24-unit buildings.  When the Debtor took possession of the property, it evicted roughly 30% of the residents for various reasons.  After the final eviction, the Debtor proceeded to market the property as a perfect place to live, since there was a waiting list of people wanting to move in.

In the early part of 2006, the Debtor was approached by numerous people in the area asking if this property was going to be converted to condos.  The Debtor then began a feasibility study and found that the market conditions were right, and the price was very economical for a student or for starter families.  The Debtor then approached Centrue Bank to obtain a loan for this project.

After numerous meetings with the CEO, CFO, CLO and the Market President Centrue Bank, the Debtor was approved for a condo conversion loan and was given additional funds to complete the renovations which were needed to make the property more desirable in the condo market.  Since the Debtor was new to the investment scene, the prospective buyers were first time home buyers, who had little money to purchase, but wanted to own their own home for less than they would pay for rent.  The Debtor also looked for the first time investor who would purchase the property with the intention of renting it to a tenant.

In the first quarter of 2007, the Debtor met with a realtor and began the process of

marketing the property. By the first half of 2007, the Debtor had sold 53 units, and in the process paid more than $2.7 million to Centrue Bank. Termano then had 55 units remaining to sell. At this point, the Debtor was approached by three different sets of investors who were looking to purchase all 55 units. After about 6 months of negotiating with the three different prospective investors, no deal could be reached.

In early 2008, the Debtor was beginning to see a decrease of activity due to the market conditions around the world. In mid-2008, Termano was approached by 2 prospective buyers, both looking to purchase 24 units, and they wanted them unoccupied as they were looking to hold the properties for the long term in the hopes of the market moving up quickly. The Debtor went to Centrue Bank asking for a partial release with a specific dollar amount being paid down with this bulk type sale. Centrue Bank advised that there should be no issues with this transaction and that the Debtor should continue on with the negotiations of the possible sale. After getting a deal almost solidified, the Debtor went to speak to Centrue Bank. The Debtor was then advised that Centrue Bank would not release its lien on the specific units.

This ended the sales of the units and began the downward spiral of the Debtor. The Debtor did not renew twenty-two (22) leases, in hopes of selling a major portion to a prospective investor. Next, the Debtor was unable to re-rent these units in a timely fashion due to the passing of the rental season and the economic climate in the U.S. The Debtor fell behind on its bills, and was unable to restructure its financing due to the economic climate. The Debtor unsuccessfully tried to obtain a restructuring loan with Centrue bank. Thus, the Debtor sought relief through chapter 11.

### III. POST-PETITION ACTIVITIES

After filing a petition for relief under Chapter 11 of the Bankruptcy Code, the Debtor was

5

able to focus efforts on marketing and selling the remaining 55 units. Since filing for Chapter 11, Termano has had about 50 showings at the property, and has secured two contracts, one for ten (10) units which closed on 11/2/09 (see below), and the other for five (5) units which was scheduled to close before December 31, 2009 (see below). The Debtor is working with its real estate broker in an attempt to continue to sell all units as envisioned in the Plan. The Debtor and its real estate broker project selling a minimum of 12 units a year and expect all units to be sold within the 36-months of the confirmation of the plan.

On November 2, 2009 the Debtor closed a 10-unit sale. Proceeds from this sale were used to pay down the Centrue Bank note by $293,153.58 and to pay off the real estate taxes owed to the Champaign County Assessor's office for 2007 ($90,025.91) and 2008 ($18,733.80). As part of the prior closing agreements with the unit buyers on the first 53 units sold, the new owners would become responsible for reimbursing the Debtor for payment of the past due real estate taxes. Debtor is actively seeking to obtain such reimbursements and has sent sixteen (16) letters to condo owners requesting payment. The recovered funds will be paid to Centrue Bank in accordance with the Debtor's agreements. If reimbursement by property owners is not done willingly, Debtor will file suit to recover funds on or before May 1, 2010.

A 5-unit sale was scheduled to close before December 31, 2009; however, the Debtor was not able to gain concessions from its creditors and the closing could not go forward as scheduled. Fortunately, the Debtor was later able to negotiate the necessary concessions and the sale was closed on January 22, 2010. Centrue Bank consented to certain carve-out of sale proceeds, including the allocation of $25,000 to the Debtor to fund future repairs of units to ready them for sale. Centrue Bank received $166,265.53 of the proceeds of the sale.

The Debtor carve-out agreement with Centrue Bank constitutes an agreement with the

secured lender to use cash collateral to rehabilitate additional units for sale and to maintain the necessary cash flow for marketing, maintaining, and paying utilities going forward, while ensuring that Centrue Bank gets paid the allowed amount of its claim. Centrue Bank also agreed to a carve-out so that the Debtor could use proceeds from the sale to pay fees awarded to its bankruptcy counsel.

According to the Debtor's Plan, Centrue Bank will continue to release its liens on any and all units to be sold by the Debtor in the ordinary course of business and to cooperate with the Debtor in the Debtor's continued marketing and sale of the units.  Specifically, Centrue Bank will be required to release its liens on the units to be sold upon presentation by the Debtor of a proposed closing statement which allows for distribution of a minimum of 85% of the net sale proceeds. Net sale proceeds shall be the gross sale proceeds minus regularly occurring transaction costs including, but not limited to; property taxes, document origination fees, broker fees, real estate attorney's fees, local governmental ordnance costs.

Debtor also has been in conflict with Commercial Coin with respect to that entity's pre-petition lease of a laundry room where it installed laundry equipment over ten years before the Debtor purchased the Property.  Debtor successfully repelled Commercial Coin's first motion to lift the stay, then obtained a court order allowing it to reject the lease.  Since that time, Debtor has been negotiating with Commercial Coin with respect to paying its administrative claim on the lease prior to the date of the court's order rejecting the lease, and also providing for additional payments of Commercial Coin's unsecured claim.

**Insurance:**  The Debtor is current with all post-petition premium payments for Property and Liability Insurance.

**Utilities:**  The Debtor has cured all post-petition amounts owed to the Urbana-

7

Champaign Sanitary District on or before January 4, 2010. The Debtor has cured all post-petition amounts owed to Illinois American Water District on or before January 4, 2010.

**Taxes:** Termano is current with all post-petition taxes.

## IV. ASSETS

The following is a summary of the Debtor's assets at the time of filing:

Real Estate: The Debtor owned the following real property: 55 convertible units located in two complexes in Urbana, Illinois with entrances at 904 N. Broadway and at 908 N. Broadway, with an estimated fair market value of $2.86 million. See Liquidation Analysis, **Exhibit A**. Currently, Debtor owns 40 such units, having sold 15 units in two bulk sales of 10 units and 5 units respectively.

Operating Accounts: The Debtor had a total of $867.85 in its operating account at the time of filing. Those funds have been expended in the operation of Debtor's business. The Debtor had $0.00 in its checking account with Centrue Bank at the time of filing.

## V. CLAIMS AND CREDITORS

The following is a summary of creditor claims against the Debtor's bankruptcy estate, sorted by claim number:

| Creditor Name | Claim Number | Secured Amount | Priority Amount | General Unsecured | Remarks |
|---|---|---|---|---|---|
| Arthur L. Mann | 1-1 | $0 | $0 | $437.50 | No objection |
| Interline Brands | 2-1 | $0 | $0 | $2,903.97 | No objection |
| Centrue Bank | 3-1 | $1,882,824.00 | $0 | $0 | No Objection |
| Area Disposal Service | 4-1 | $0 | $0 | $2,612.77 | No objection |
| City of Urbana | 5-1 5-2 | $5,875.47 | $8,066.66 | $2,191.19 | Withdrawn 7/6/2009 |
| City of Urbana | 6-1 | $5,875.47 | $8,066.66 | $2,191.19 | Entered in error |

8

| City of Urbana | 7-1 | $2,489.32 | $0 | $1,035.00 | Objection, paid in full |
| Tessy Cuy | 8-1 | $0 | $12,914.50 | $0 | Objection |
| U-C Sanitary District | 9-1 | $0 | $0 | $2,784.02 | Objection, paid in full |

**DISPUTED CLAIMS**

The claims listed below, sorted alphabetically, were listed in Debtor's schedules as being either "contingent, unliquidated, or disputed." The holders of these claims have not filed a proof of claim within the required time. Therefore, pursuant to Bankruptcy Rule 3003(c)(2), the holders of the claims listed below will not be entitled to vote or receive any distribution.

| **Creditor** | **Amount** | **Classification** |
|---|---|---|
| Able Aire | $ 1,500.00 | Disputed Claim (Unliquidated) |
| Ameren IP | $ 6,000.00 | Disputed Claim (Unliquidated) |
| AT&T | $ 1,100.00 | Disputed Claim (Unliquidated) |
| Orkin Pest Control | $ 4,000.00 | Disputed Claim (Unliquidated) |
| Insight/Comcast | $ 50,000.00 | Disputed Claim (Unliquidated, Disputed) |

**CLAIMS OF CREDITORS THAT FILED NO PROOF OF CLAIM:**

The Bar Date for general unsecured claims was June 12, 2009. If the claim was scheduled by the Debtor as "disputed," "unliquidated," or "contingent," then the Debtor will object to any late filed proof of claim.

**CLASSIFICATION OF CLAIMS:**

Unclassified Claims consist of Administrative Claims including; (a) claim of the Debtor's Attorneys, in an amount as yet undetermined, but estimated at approximately $25,000.00; (b) the

9

administrative priority claims of Commercial Coin in the sum of $8,100; and (c) the statutory fees owing to the U.S. Trustee, in an amount as yet undetermined, but expected to be current at time of confirmation. On the Effective Date, the Debtor shall pay Commercial Coin's Administrative Claim, if the Debtor is unable to make payment at the time, Commercial Coin will receive $1,012.50 from the proceeds of the first six post Effective Date unit sales.

The remaining actual claims fall into the following classifications, sorted by claim Classification:

| Creditor | Amount | Claim No. | Classification | Remarks |
|---|---|---|---|---|
| Centrue Bank | $ 1,882,824.00 | Claim 3 | Class I | No objection |
| City of Urbana | $ 5,875.47 | Claim 6 | Class II | Filed in error |
| City of Urbana | $ 2,489.32 | Claim 7 | Class II | Paid in full |
| City of Urbana | $ 1,035.00 | Claim 7 | Class III | Paid in full |
| City of Urbana | $ 8,066.66 | Claim 6 | Class III | Filed in error |
| Champaign County Assessor | $ 65,000.00 | N/A | None | Paid in full |
| Tessie Cuy | $ 12,914.50 | Claim 8 | Class III | Objection |
| Area Disposal Service | $ 2,612.77 | Claim 4 | Class IV | No objection |
| Arthur L. Mann | $ 437.50 | Claim 1 | Class IV | No objection |
| Illinois American Water | $ 5,000.00 | N/A | Class IV | No objection |
| Interline Brands dba Wilmar | $ 2,903.97 | Claim 2 | Class IV | Objection |
| Midstate Collection Solutions | $ 3,944.17 | N/A | Class IV | Objection |
| Technology Specialist | $ 3,203.50 | N/A | Class IV | Objection |
| Commercial Coin | $ 42,480.00 | N/A | None | No Objection |
| Ameren IP | $ 6,000.00 | N/A | None | Disputed Claim |
| AT&T | $ 1,100.00 | N/A | None | Disputed Claim |
| Able Aire | $ 1,500.00 | N/A | None | Disputed Claim |

| | | | | |
|---|---|---|---|---|
| Orkin Pest Control | $ 4,000.00 | N/A | None | Disputed Claim |
| Insight/Comcast | $ 50,000.00 | N/A | None | Disputed Claim |

## VI. THE PLAN

The Debtor expects to continue its business of rehabbing and selling real estate in Chapter 11, having proposed in good faith a feasible plan under § 1129(a) to satisfy its secured creditors, priority unsecured creditors, and general unsecured creditors, and other holders of allowed claims. The plan provides that, should Debtor fail to obtain the votes required to confirm a consensual plan, it will nevertheless ask the Court to confirm the plan under § 1129(b) as being fair, reasonable, and in accordance with Code provisions.

### CLASS I CLAIMS: ALLOWED SECURED CLAIM OF CENTRUE BANK

Class I is impaired and entitled to vote on the Debtor's Plan. Centrue Bank holds a secured claim in Debtor's estate, secured by a mortgage on property located at 904 – 908 N. Broadway as well as an assignment of rents on the same property. Centrue Bank filed Amended Proof of Claim Number 3-2, in which it claims it is owed $1,882,824.00. To the extent this claim is allowed, it will be paid in full during the Plan, prior to any distribution to holders of Class II – V Claims. The holder of the Class I Claim will be paid post-petition interest at the annual rate of 6% on the declining balance of the allowed claim. Some funds to pay the claim will derive from net proceeds of the sale of each unit at a minimal rate of 85% per closed sale.

During the pendency of the plan, the Debtor will furnish Centrue Bank with copies of any contract for sale of real estate entered into, as well as projected closing costs and income from the sale. The Plan requires that, as long as each sale provides Centrue Bank with the minimal percentage of net proceeds provided for within the plan, prior to the closing on each sale,

11

Centrue Bank will timely provide partial releases of its lien for the unit or units being sold, as well as other documentation necessary for closing.

### CLASS II CLAIMS: ALLOWED SECURED CLAIMS OF CITY OF URBANA

Class II is unimpaired and, in fact, has been paid in full prior to confirmation. Thus, the City of Urbana is not entitled to vote and is presumed to accept the Debtor's Plan. The City of Urbana filed Proof of Claim Number 6, claiming a secured amount of $5,875.47 for unpaid governmental taxes or penalties relating to nonpayment of recycling taxes. The Claims Register lists Proof of Claim 6 as being filled in error. Nothing will be paid to the City of Urbana based on Claim No. 6. The City of Urbana also filed Proof of Claim Number 7, claiming a secured amount of $2,489.32 for unpaid rental registration fees. Claim 7 has been paid in full. Should the court determine that any sums are owing to the City of Urbana pursuant to Claim No. 7, funds to pay the claim will derive from net proceeds of the sale of the condominium units, and post-petition interest of 6% will be paid on the declining balance of the allowed claim.

### CLASS III CLAIMS: ALLOWED UNSECURED CLAIMS ENTITLED TO PRIORITY BY THE BANKRUPTCY CODE, 11 U.S.C. §507(A)(1) – (10)

Class III is unimpaired and, in fact, has been paid in full prior to confirmation. Thus, the City of Urbana is not entitled to vote and is presumed to accept the Debtor's Plan. The City of Urbana filed Proof of Claim Number 6, claiming an unsecured priority amount of $2,191.19 for unpaid governmental taxes or penalties relating to nonpayment of recycling taxes. The Claims Register lists Proof of Claim 6 as being filled in error. Nothing will be paid to the City of Urbana based on Claim No. 6. The City of Urbana also filed Proof of Claim Number 7, claiming an unsecured priority amount of $1,035.00 for unpaid rental registration fees. Claim 7 has been paid in full. Should the court determine that any sums are owing to the City of Urbana pursuant

to Claim No. 7, funds to pay the claim will derive from the net proceeds of the sale of condominium units.

The Debtor listed the Champaign County Assessor on Schedule E as an unliquidated and disputed claim for real estate taxes. The Champaign County Assessor filed no proof of claim, however the full amount of the claim was satisfied from the gross proceeds of the sale of 10 units that closed on November 2, 2009. Thus, Debtor will pay nothing further on this claim. To the extent that the real estate taxes paid at the closing on 11/2/2009 are attributable to the owner of a condominium unit not owned by the Debtor, the Debtor is seeking to recover such sums from the respective unit owners and transfer such sums to the Bank.

Tessie Cuy filed Proof of Claim Number 8 as a Priority Claim for unpaid wages. Debtor intends to object to this claim and to pay nothing to the claimant. To the extent this claim is allowed as a Class III claim against the Debtor, it will be paid in full during the Plan, prior to any distribution to holders of Class IV & V Claims.

**CLASS IV CLAIMS: ALLOWED GENERAL UNSECURED CLAIMS WITHOUT PRIORITY**

Holders of Class IV claims are impaired, and therefore entitled to vote on the Debtor's Plan. The following table indicates the creditors who possess general unsecured claims without priority, and the Debtor's intentions with regard to each creditor. To the extent these claims are allowed, they will be paid in full during the Plan, prior to any distribution to the holder of Class V Equity Interests of the Debtor.

| Creditor | Amount | Claim No. | Classification | Debtor's Intent |
| --- | --- | --- | --- | --- |
| Area Disposal Service | $ 2,612.77 | Claim 4 | Class IV | No Objection |
| Arthur L. Mann | $ 437.50 | Claim 1 | Class IV | No Objection |
| Illinois American Water | $ 5,000.00 | N/A | Class IV | No Objection |

13

| | | | | |
|---|---|---|---|---|
| Interline Brands dba Wilmar | $ 2,903.97 | Claim 2 | Class IV | Objection |
| Midstate Collection Solutions | $ 3,944.17 | N/A | Class IV | Objection |
| Technology Specialist | $ 3,203.50 | N/A | Class IV | Objection |
| U-C Sanitary District | $ 2,784.02 | N/A | Class IV | No Objection |
| Commercial Coin | $ 42,480.00 | N/A | Class IV | No Objection |

**CLASS V CLAIMS: EQUITY INTERESTS OF THE DEBTOR**

The holder of Class V equity interests of the Debtor, Eric Olsauskas, will retain an equity interest in the Debtor. Eric Olsauskas will receive equity distributions if and only if allowed claims of senior classes I through IV receive 100% distribution and interest if so specified.

**TREATMENT OF CLAIMS BY THE PLAN:**

The unclassified claims of the Debtor's Attorneys, Commercial Coin Laundry Systems, and the United State Trustee will be paid from the rental income of units or from proceeds of the sale of condominium units. Debtor will control the terms of said rentals, and currently expects each rehabbed unit to rent for between $525.00 and $620.00. Debtor further expects that the sale of individual units will range from $62,500 to $65,000 during the next three years.

All fees of the United States Trustee will be paid current prior to confirmation. The Debtor estimates that there is sufficient equity in its assets to pay all holders of Class I – IV Claims 100% of their allowed claims, plus interest if so specified. Debtor intends to use rental income from condominium units to pay for administrative expenses and post-petition utility expenses, rehab and operating expenses, and taxes, until said rented units are sold as condos. If additional income is needed to cover these administrative or post-petition expenses, then Debtor

reserves the right to use up to 5% of the net proceeds from the sale of any particular unit, while paying the required minimal 85% to Centrue Bank until its allowed claim is paid in full. Debtor estimates that there is sufficient equity to utilize 5% of sale proceeds, and still pay the holders of Claims I – IV as specified above.

After confirmation, the holder of the Class I claim (Centrue Bank) will be paid first 100% of its allowed claim plus 6% annual interest on the declining balance of its claim. The unclassified claims of Debtor's counsel and of Commercial Coin will be paid from rental income and from carve-outs from the gross proceeds of the sale of condo units. After the Class I claim is paid in full, then the holder of Class II claims (City of Urbana) will be paid 100% of the balance, if any, of its allowed claim plus 6% annual interest on the declining balance of its allowed claim. After Class II claims are paid in full, then the holders of Class III claims (Unsecured Claims Entitled to Priority) will be paid in full for 100% of the balance, if any, of their allowed claims. After Class III claims are paid in full, then the holders of Class IV (General Unsecured Creditors) claims will be paid in full for 100% of their allowed claims. If and only if Class I – IV are paid in full for their allowed claims, plus interest if so specified, then the holder of Class V equity interests of the Debtor will receive the remaining net proceeds as equity, from the liquidation of the remaining condominium units.

Payment of Class IV claims will be ensured through funds being placed into an interest bearing escrow account upon the closing of each unit sale. From proceeds of the sale of individual units (expected to range between $62,500 and $65,000 each), 1% of the net sale price will be carved out and placed into escrow for the payment of allowed Class III claims, if and only if there are any such allowed claims. When the escrow contains funds sufficient to fully pay all Class III claims, the 1% escrow carve outs for that purpose will cease. Upon full

payment of Class I and II claims, monies held in escrow will be distributed to the Class III claimants, if any exist. From proceeds of the sale of individual units, 8% of the net sale price will be carved out and placed into escrow for the payment of Class IV claims. The escrowed funds will be held and controlled by Debtor's bankruptcy attorney. When the escrow contains funds sufficient to fully pay all Class IV claims, the 8% escrow carve-out will cease. Funds held for payment of Class IV will be held in escrow until Class I, Class II, and Class III claims have been paid in full. If at the end of the plan there are insufficient funds to make all payments to Class I, Class II, and Class III claims, the escrowed funds will be used to pay to pay Class I, Class II, and Class III claims. Upon final payment of Class I, Class II, Class III, and Class IV claims the remaining escrowed funds will be used to pay the Class V Equity Interest. Debtor reserves its right to modify the plan as is needed to benefit the estate.

## CONTINGENT TREATMENT OF ESTATE PROPERTY AND CLAIMS

The Debtor expects to be able to pay its creditors in full within the life of this plan through a combination of rental income and unit sales in the ordinary course of business. If the Debtor cannot fund this plan with $375,000.00 annually, as determined from day of plan confirmation, the Debtor will liquidate up to 8 units annually, as determined from the day of plan confirmation. If such a liquidation is necessary, the funds will be distributed as outlined above.

## THE PLAN IS FAIR

The Debtor asserts that its Plan is feasible and fair, and, if creditors do not consent to it, the Debtor will nevertheless ask the Court to confirm it under § 1129(b).

A liquidation analysis is attached hereto as **Exhibit A**. In summary, it shows that the total liquidation value of Debtor's assets is as follows:

| Item | FMV | Liquidation value |
|---|---|---|
| Real Property | $2,867,700.00 | $1,823,700.00 |
| Personal Property<br>- Accounts | $1,200.00 | $1,200.00 |
| TOTAL FAIR MARKET VALUE | $2,868,900.00 | |
| TOTAL LIQUIDATION VALUE OF DEBTOR'S ASSETS | | $1,824,900.00 |

The following Secured Claims and Administrative Priority Claims that would need to be satisfied before any funds would be paid to unsecured creditors:

| Claimant | Estimated Amount |
|---|---|
| Secured Claim No. 3 by Centrue Bank | $2,360,284.77 |
| Secured Claim No. 6 by City of Urbana | $5,875.47 |
| Secured Claim No. 7 by City of Urbana | $2,489.32 |
| Priority Claim No. 6 by City of Urbana | $2,191.19 |
| Priority Claim No. 7 by City of Urbana | $1,035.00 |
| Unclassified claim of Commercial Coin | $8,100.00 |
| Debtors' Bankruptcy Counsel | $25,000.00 |
| Estimated Chapter 7 Trustee Fees | $5,000.00 |
| Estimated Trustee's Broker | $111,435.00 |
| Estimated Trustee's Real Estate Counsel | $30,250.00 |
| **TOTAL SECURED AND ADMINISTRATIVE PRIORITY CLAIMS** | **$2,395,015.75** |

Before unsecured creditors would be paid any money, all claimants with a higher priority under 11 U.S.C. § 507(a) must be paid in full from the proceeds of liquidation by a chapter 7 trustee. Under the above liquidation analysis, after claimants with higher priorities are paid,

17

there would be $0.00 available to pay general unsecured creditors without priority. Under Debtor's plan, unsecured creditors will receive up to 100% of their allowed claims.

## VII. DEBTOR'S FINANCIAL CONDITION

The Debtor has filed operating reports for the months of October 2009 through December 2009, with January 2010 being unavailable until mid February. The monthly summaries indicate income of $10,009.60 for September, $9,884.86 for October, $5,038.50 for November, and $5,075 for December. The monthly average of income during the four months is $7,501.99. Debtor's most recent operating report for December is attached hereto as **Exhibit B**. Debtor is working with Stephanie Pratt, an agent of Broker Coldwell Banker Devonshire Realty, to sell the forty-five (45) remaining condominium units located at 904 and 908 N. Broadway.

The Debtor's Three Year Projection of Income and Expenses is attached hereto as **Exhibit C**. Exhibit C indicates that the Debtor anticipates total gross revenue of $1,078,000.00 for Year 1, $1,222,166.00 for Year 2, and $1,202,166.00 for Year 3. As is set forth in full detail in Exhibit C hereto, the Debtor estimates that it will have funds available for plan payments in the following amounts; $826,059.00 year 1, $994,853.00 year 2, and $989,502.00 year 3. Projected plan payments are set forth in **Exhibit C**, attached hereto. These figures represent estimates; actual plan payments may increase or decrease depending on rental income fluctuations and on the speed of the sales of the condominium units.

## VIII. THE PURPOSE OF THIS DISCLOSURE STATEMENT

Together with this Disclosure Statement, the Debtor has filed with the Court his proposed Plan of Reorganization. The purpose of this Disclosure Statement is to provide each creditor with a description of the Plan to aid her/him in making an informed decision as to whether to accept or reject the Plan. Each creditor in an impaired class is entitled to vote on acceptance of the Plan. A copy of the Plan accompanies this Disclosure Statement. THE DISCLOSURE

STATEMENT PROVIDES A BRIEF SUMMARY OF THE PLAN AND OTHER INFORMATION WITH RESPECT THERETO AND IS NOT INTENDED TO TAKE THE PLACE OF THE PLAN.  EACH CREDITOR IS URGED TO STUDY THE PLAN IN FULL AND TO CONSULT WITH COUNSEL WITH RESPECT TO THE PLAN AND his EFFECT ON HIS RIGHTS.

The Court will set a date for a hearing on the confirmation of the Plan.  Creditors may vote on the Plan by filing out and mailing the accompanying Ballot for Accepting or Rejecting The Plan to:  Closing Department, 7th Floor Dirksen Building: 219 South Dearborn St., Chicago, IL 60604.  In order for the Plan to be accepted, claimants holding at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the allowed claims in impaired classes who vote, must vote in favor of the Plan.  The Plan might be confirmed with the acceptance of one Class of Claimants as described hereafter in the final paragraph.

NO REPRESENTATIONS CONCERNING THE DEBTOR ARE AUTHORIZED THAN AS SET FORTH IN THIS STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE WHICH ARE OTHER THAN AS CONTAINED IN THIS STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO THE OFFICE OF THE UNITED STATES TRUSTEE WHICH, IN TURN, SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO CERTIFIED AUDIT.  THE DEBTORS DO NOT WARRANT OR REPRESENT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY, ALTHOUGH CONSIDERABLE EFFORT HAS BEEN MADE TO BE ACCURATE.

The Debtor has proposed his Plan of Reorganization in good faith and in compliance with the applicable provisions of the Bankruptcy Code.  Regardless of the results of voting under any class of claims, the Debtor may ask the Court to confirm the Plan of Reorganization which can

occur as provided by law if the Court finds that the Plan does not discriminate unfairly and is fair and equitable with respect to the rejecting creditors described is such class. This option can occur only if the Court makes the requisite findings after being presented with supporting evidence.

        Respectfully submitted,

        TERMANO, LLC


        By: /s/ Forrest L. Ingram
           One of its attorneys

Forrest L. Ingram
Philip Groben
Vik Chaudhry
FORREST L. INGRAM, P.C.
79 W. Monroe, Suite 900
Chicago, IL 60603-4907
(312) 759-2838
Atty. No. 3129032